Stoll, Kenan, Odgen, P, LLC, et al. Oral argument as follows. 15 minutes for the plaintiffs, 15 minutes to be shared by the defendants. Mr. King for the plaintiff appellant. Good morning. Good morning, your honors. May it please the court. Brian King, counsel for the plaintiff in this case. I've reserved five minutes for rebuttal. Very well. This case involves the plaintiff's employer who sponsored a self-funded health benefits plan. The health benefits plan was administered by third party administrator Anthem Blue Cross Blue Shield. T E's son C E struggled from a variety of mental health issues and he was treated at a residential treatment facility named Elevations beginning on February 19, 2020, and it ended in October of 2020. Anthem covered the first three weeks or so of the treatment at issue, but they determined that the coverage was not medically necessary after that point. They sent a March 13, 2020, denial letter. And it identified, did two things that we think were problematic. Number one, it identified acute care criteria such as danger to self as shown by hearing voices or voices telling them to harm themselves or others or persistent thoughts of harm that could not be treated at a lower level of care than residential treatment. And the second thing it did is it had a statement that the reason that the medical necessity did not exist was because C E's condition, quote, remains improved, you remain safe, you remain medically stable, you have support, family session has been completed, and it does not show that you're a danger to yourself or others. No reference to the specifics in the medical record. A series of conclusory statements. The family objected to that. They said, no, no, no, that's not right. So they sent an appeal letter on September 1, 2020, and they outlined in that appeal letter, it was a long, extensive letter. It was accompanied by two specific statements of medical necessity. They talked about, they forwarded all the medical records to that date that their child had at elevations. And they included a letter from Dr. Judith Axelrod, an MD and Todd Johnson, a master's in education, that had a statement, a recommendation that the residential treatment that this young man was going through was medically necessary. And there was also a June 18, 2020, letter from Jill Engel, a clinical psychologist and licensed professional counselor associate. And Ms. Engel's letter, she was one of the treating clinicians for this young man out at elevations. I believe she was at elevations. The reason that I say that is because the letter is very specific about some of the things that this young man was going through. The licensure is actually a Kentucky licensure. So that's, Your Honor, what makes me wonder if she was at elevations out in Utah or whether she was in Kentucky. I thought she was in Kentucky, but I could be wrong. You could be right, Your Honor. But it's very specific about this young man's condition and talks about the need for a treatment period given his long history of going up and down the spectrum of inpatient care at hospitals versus outpatient care and then regressing. And her opinion was very clear in saying this young man needs an extended period in residential treatment in a subacute inpatient setting. It's not a hospital setting. It's something lower than that. But it's more than an outpatient setting. And it was quite detailed. And one of the things that happened after that, that information was submitted. Then on December, or rather on October 21, 2020, there was a denial letter back from Anthem. Can I ask you just a legal question about her and the others? Should we treat the treating physicians in Kentucky, meaning pre-elevations, the same as we would treat the treating people at elevations? In other words, why are they relevant to what's going on at elevations? And why wouldn't we pay particular attention, if we're going to pay attention, to the treating physicians at elevations? Thank you, Your Honor. It's an excellent question. And the answer is because what we're talking about when we're talking about approving and making decisions to pay these claims are prospective evaluations by treating clinicians about what the child needs. In other words, we don't have the luxury of looking in hindsight and saying, well, did the treatment work or not? These are clinicians who are making recommendations and decisions, and the family's making a decision about whether this child needs residential treatment or something lower. I totally get that. But I guess my point is you're treating, and then you're sent to elevations. And in theory, the insurance company's theory is elevations helped, and so the status changed. Because initially they approved it, and then they balked. And so why isn't the critical analysis what the people at elevations... I'm just thinking practically, not... Especially when you have an approval, I don't disagree with you, Judge. I think that the records at elevations are the critical thing to look at. And what we see in the denial letter from Anthem is no specific reference to the records at elevation at all. No engagement with them. Those records were very detailed. And the family talks about them in their appeal letter. And they say, this is why this child needs the treatment. And what we got back on both... You know, because we said this in the brief. The October 31st, 2020 letter makes no reference to either the medical records or those letters of medical necessity. And the really troubling thing is on December 21st, the family sends a second level appeal. They complain about, hey, you haven't even engaged with these records. You haven't even acknowledged our letters of medical necessity or anything else in the medical records. And what comes back on January 26th of 2021? A verbatim letter from Anthem. It's remarkable. And that's supposed to be the full and fair review that we're assured Anthem carried out. And Anthem says, hey, we looked at everything. But it's patting you on the head and saying, here's your drink of water. Go to bed. But it's not something that's a meaningful dialogue. And one of the things that we tried to emphasize in our briefing, Your Honors, is that the Sixth Circuit should be looking at other circuits across the country that have more and more come in line with the idea, especially in these mental health claims, that there has to be a meaningful dialogue in the pre-litigation appeal process. Especially when the claimants, as in this case, have presented such detailed, explicit, specific information about why the treatment's medically necessary. The claim procedure regulations of ERISA contemplate that there will be a meaningful dialogue, that there will be a response to the specific information that's provided by the family. That is to make that pre-litigation appeal process a meaningful process to basically avoid what we've got today. Claimants who feel that they've been ignored by an insurance company and they feel there is no other option but to sue and bring their claim before a court who will look at the details of the pre-litigation appeal process. So that's what we have here. Let's say we look at it all and we agree with you. Shouldn't we remand versus reverse? Other courts have struggled with that, Your Honor. The Tenth Circuit, which is Case Law, of course, which I'm most familiar with, has said basically you should remand only if it's not clear on the record that the claim should be paid. If there are questions that exist based on the record as it was developed. That's similar to our standard. I guess the worry we typically have is that we're not medical professionals. And it seems that we can review a record. You're asking us, if we reverse, you're asking us to make the next step, which gets harder. Look, Your Honor, I get the position that the federal judiciary is in, in the sense that you're neither clinicians nor experts in health insurance. But a remand wouldn't break my heart. I do think it's critically important that the Sixth Circuit, in this case, make clear there has to be a more robust, meaningful dialogue between these parties than what we saw in this case. On that issue, do you agree that we not only look to the letters when we're assessing the nature of the review, but also to the underlying reviewing clinicians' notes? Thank you, Judge Hermendorfer. That's an excellent question. We do object to the fact that what the district court did here is say, I'm going to go beyond the letters that were exchanged between the parties and look for myself. As you just said, Judge Thabar, I mean, you guys, the district court judges and the circuit court judges are not clinicians. It's very difficult for them to go through themselves and sort out what should have been exchanged and discussed in the pre-litigation appeal process. Most other circuits that I'm aware of that have addressed the specific issue that you just asked about, Judge, say, no, especially on an abuse of discretion standard of review, we're going to hold your feet to the fire defendants, insurance companies, third-party administrators, and have you require that you carry out a meaningful dialogue in the pre-litigation appeal process and that you show your hand, you show your cards, that you don't treat claimants like T.E. as a mushroom, keeping him in the dark and feeding him manure. That's not the way it works in a pre-litigation appeal process. It's meaningful and fair and that is going to resolve these cases short of them having to be presented to the federal judiciary because claimants like T.E. say, this was a joke, this was a travesty, this whole pre-litigation appeal process. We could apply that same standard in terms of requiring robust assessment of, say, treating clinicians. And Dr. Engel, my understanding, was at Our Lady of Peace Hospital where he was actually hospitalized and not at elevations. But you can still say we can look to the underlying explanation from the reviewing assessors and that nonetheless still fails to show the adequate work in grappling. Thank you, Your Honor. I think that's exactly true in this case because the underlying notes don't come to grips with the MCG criteria. So if you want to go in that direction, I still think we win. But here's the point. I think that to do so undermines the pre-litigation appeal process and the integrity of that and the need for the anthems of the world to treat claimants really thoroughly and fairly in the pre-litigation appeal process to consider what they present and to have a meaningful dialogue with them. So I'll reserve my remaining time. Thank you. May it please the Court, Myles Harrison on behalf of the Appellee Anthem Health Plans of Kentucky. The district court's detailed and reasoned ruling should be affirmed for three simple reasons. First, based on the detailed review conducted by Anthem's clinical medical reviewers that are board certified in psychiatry, there was substantial evidence within the objective record. What was that information conveyed to the plaintiffs? I mean the internal review documents that you've talked about that the district court looked at, were those furnished? So in this particular case, the internal reviewer notes were not provided to Mr. Eifler, but they were also not specifically requested that I'm aware of, that I can see in the record. We're looking at the procedural fairness, I guess, of the denial letters and whether they're reasonable and if all they contain is conclusions without the documentation, you're saying that's sufficient because they don't have to disclose what the conclusions are based on? So the source of what's in the denial letters is coming from ERISA. Yeah, but they have no idea what you're ahead of them. I mean, there are really two issues here. Isn't there like a procedural fairness issue and then you get to the merits of whether the ultimate denial was arbitrary and capricious, but your client has an obligation to procedurally explain the denial, don't they? Yes, and that was contained within the denial. Okay, I see the denial. It's just total conclusions without any substance to them and there's just one after the other. As we said in our prior conclusion on the prior letter, this is not medically necessary, but it doesn't explain it. And I know the standard review here is quite in your favor, but doesn't there have to be a little bit more here? I believe there was more than what is being represented by appellant. Okay, tell me why these letters are more than just conclusions. So they are speaking to the clinical criteria that CE's treatment was being evaluated under, which are the MCG guidelines that were referenced in all of the letters that appellant was directed to during the appeal process. And each of those factors were being considered and what's reflected in the denial letters is directed by what's the language in ERISA, which is that the communications of these denial letters and the denials needs to be done in a manner calculated to be understood by a claimant. That's not a claimant who's an attorney as appellant's father or appellant is here. It's to an ordinary claimant that would be able to understand what is meant by the denial. And that's why it's being phrased in very plain language. It doesn't explain why it's denied. It just comes to the conclusion it's not medically necessary, but it doesn't say why, does it? I would say it does speak to it. So in terms of the specific clinical criteria that is being addressed in the first initial denial letter, it speaks to that the condition remains stable. Which one are you talking about? I'm sorry. The March 13th. You're talking about the first denial letter? Yes. I want to talk about that. It says, among other things, am I understanding this right, under the discharge guidelines, you need to show both that you're not evincing homicidal, suicidal ideation, harm to others, harm to self, and that you don't have severe functional impairment. It's not just that you're not suicidal, homicidal, it's the other thing too. Yes. So then the letter goes on to say CE has remained safe, improved, medically stable. But we have the case manager's notes from March 10th that say things like he was placed on a dorm restriction for safety issues. He slammed himself into a door. He reported having aggressive feelings towards peers. So I guess I could spot you even that we could look at the letter and that it advanced justifications, but what if those justifications bear kind of no resemblance to the case notes we're seeing from the treatment facility? You're referencing the notes from elevations? Yes, the March 10th. These are similar notes to the ones that justified initial authorization of the treatment. That Shaw said he reviewed, I thought. Yes, and that's correct. Everything was reviewed. And the fact that Anthem's board-certified reviewer used their clinical medical judgment and determined that this has not met the clinical criteria. Similar to Judge Wittendorfer's in that, Herman Dorfer's, I'm sorry. Wittendorfer has a nice ring to it. Is that Shaw says, I mean, it just seems sloppy to me. He says that CE is a female when CE is a male. He doesn't reference any of this stuff and says not violent, even though three days before, as Judge Hermendorfer just went through, the case manager's note shows all of that. And then the original reason to put him in was something completely different. As she pointed out, there were two independent things, and he doesn't even reference the mood disorder and all of that. And so, I mean, how can that not be arbitrary and capricious when you're saying you've reviewed it, but you don't even explain why we should discount it? So what's envisioned by ERISA is not a line-for-line annotation or response to every single thing contained within the medical records. It is, particularly in reviewing a decision by an administrator, was there substantial evidence within the record to support the ultimate decision? I get the standard. I guess my problem is when you're saying he's not violent and the case manager, him or herself, is saying there's safety issues, he's on a dorm restriction, he's verbally aggressive towards his peers, he consistently gets in conflicts with his peers, he's argumentative, he shows emotional dysregulation, he's not cooperative. I mean, you've got to do something with this. All of these blatant contradictions of Dr. Shaw's conclusion, Dr. Shaw who couldn't even get the gender right, I mean, when I'm looking at it and just reading through it, I'm like, you've got to do a little more than this. And slamming himself into a door, how is that not dangerous? Like, at least you have to explain to us, the reviewer, how when we look at all of this, it's not arbitrary and capricious to essentially say, oh, I came to a different conclusion. So when you look within the records, there are also multiple references to his lack of suicidal ideation, homicidal ideation, that there's numerous references to he is not a threat to others. There are numerous references that he is not at danger of harming himself. And that's speaking to the first portion of the clinical criteria that the reviewers are being guided by. He didn't have those things when they admitted him to elevation, because that's necessary but not sufficient to meet the discharge guidelines is to not have kind of danger of harm. There's the whole other functional aspect of how you're carrying out your day-to-day tasks. And to add to what Judge Tappar kind of enumerated, he's having trouble fulfilling basic hygiene tasks. And will often have to be dismissed to his room for long periods because he's having a breakdown or emotional distress. So I guess I could spot you on the no suicidal ideation, no harm to others. But it seems like that's missing kind of half of the equation here. And I understand what you're saying, Your Honor. And the point really is that when you're looking within the records, there's also evidence that supports the decision here by the reviewers. And there doesn't need to be, you know, the fact that there could be some other rational decision that could have come out doesn't mean that this decision was not supported by the evidence in the record. Well, that might be true as a substantive matter. And I think to Judge Tappar's point, maybe that's why you would remand to say, look, maybe you do have solid medical reasons. Maybe there is sufficient evidence for this decision. But procedurally, there was just a faulty process here. And so try again. And on the procedural point, it would be helpful to me to understand your view of our law with respect to the duty to address treating clinicians and countervailing medical evidence. Because as I read your briefs and as I read the district court's opinion, the premise seems to be so long as I make reference to a treating clinician and don't affirmatively misrepresent what that clinician has said, then I've done my duty. Is that your position? Yes, effectively. It's that when you're looking at the totality of the record, you are giving consideration to, in guidance by the criteria that you're utilizing as the reviewer, that you are looking at using that criteria to evaluate the medical records and what's within those. And while you're focused on that, the meaningful dialogue that is being proposed here is not something that the Sixth Circuit has ever utilized. We have said you have to address treating clinicians. I mean, I see no mention of Dr. Engel's letter anywhere in the record. And to the point that Judge Thapar was referencing with appellant's counsel, Ms. Engel, Ms. Axelrod, Mr. Johnson, these three individuals that were in two letters that appellants are essentially putting their whole case on and relying on as their basis, they're not treating physicians. They are physicians, in Mr. Johnson's case, who treated CE from, I think, 2010 to 2013. Ms. Axelrod had not seen him since December of 2019. And the ultimate decision here, and if you're looking at Ms. Engel, her care stopped at the beginning of February. So a month before you think is too far outside the bounds. So the point is that the decision at the point that Anthem was looking at this is, was continued care necessary based on the clinical criteria? And what we're being pointed to is some people who cannot speak to that question. And that's the only thing that has been cited as the basis for focusing on. I guess my struggle is all of that plus, it just seems to me like you get to Fisher, and Fisher seems to be selectively reviewing things and ignoring other things. So when Fisher looks at Manley's report, acknowledges the parts that support Anthem, but doesn't even discuss the parts that cut against Anthem. And then we talk about Engel. I think that, like Judge Hermendorfer pointed out, could reasonably be within the scope. And our decision in Elliott pretty clearly says that not going over those types of things makes it arbitrary and capricious. But then what really got me is, and maybe you can explain this, is Fisher references the Malou note and says, does well on one-on-one walks with staff as these help him feel important. But that's not what the note actually says. It says that struggling with program peers and staffs, and he might do well with some one-on-one walks with staff, which is much different than does well with. And so it just, I mean, the whole thing to me seems sloppy. And then Fisher also doesn't even acknowledge the parts of the Malou note that say he's disruptive, agitated, angry, and struggling with the program. So, I mean, that's where it's like, I don't know, Judge Easterbrook said clearly erroneous is like stinks like a dead fish. Something like arbitrary and capricious, I mean, when you look at all this, to me it stinks like a dead fish. Obviously we disagree respectfully with that. But what do you do with Fisher? I mean, what do you do with what I just brought up? Like how can I look past all that? So what's required in an ERISA is not, again, it's not that these reviewers or in the denial letters that we're engaging in a lengthy medical dissertation disputing anything that is, you know, maybe slightly different than what is supporting the reason. And I'll spot you that. But I just want to understand like arbitrary and capricious, right, is a standard. It's not like, okay, just complete deference. And when you see all this stuff, isn't it incumbent upon them? They're trying to explain. Let's take the courts out of it. They're trying to explain to a family why Anthem is not going to pay for the coverage. Don't they have an obligation when the family is seeing all the stuff? He's angry, he's agitated, he doesn't do well with others, all these things. He slams himself into a door. And then you're saying, oh, don't worry, he's not violent. Don't they have an obligation at least, I know this doesn't exist in our circuit, but to give a reasonable explanation as to all the doctors and case managers are saying one thing and you say, no, no, no, don't, our file reviewer looked at it and don't worry about what they're saying. They don't even discuss it and say, no, here's why we think. They just ignore it. And that's where I'm struggling. I guess I would disagree that they've ignored it. They've not necessarily gone into every single daily note and described whether that did or did not support the decision. They did not go through line by line and say, this is right, this is wrong, or look at on March 10th it said this, on March 9th it said this, and go through everything like that. That's not what happened and that's not what is required. And really if we were going to do that and that's the kind of system that we create. Is it required to have more than just a boilerplate letter that you could send out in any case, say we reviewed everything and we hereby deny it because it's not medically necessary? I mean, do you concede that you've got to do something more than just boilerplate? And we certainly did here. These were not boilerplate letters. You certainly did? Okay, it's pretty close to boilerplate, isn't it? So Appellant references the two appeal denial letters and makes a point to try to say that they are verbatim the same. They do contain similar language, but when you look at the second level appeal, it has two full paragraphs specifically responding to things that were argued by Appellant in the appeal letter. It's speaking to you complained or suggested that we didn't have a properly credentialed person review it. Here are the credentials of our level one appeal reviewer. You made a point that there is a Parity Act violation. Affirmatively stating on that. So it's not a verbatim letter. It is very much dealing with and referencing things that were contained within the appeal letters and responding to those. And when you look at the totality of everything that was communicated between the three denial letters plus the contemporaneous clinical reviewer notes, they certainly support the decision here. ERISA does not require perfection. That is not what is expected by ERISA, and you could probably poke holes in any administrative decision if you really wanted to. Would you think it would be arbitrary if in issuing a decision in this case, we said we've read the brief of Anthem and we conclude that it is insufficient, period? If you went on to say here are three reasons, which is what our opinion was. The reasons are legally insufficient to us to support relief under ERISA. Is that under our precedent, period? Is that, in your view, would you feel like that would be a procedurally reasonable outcome or one that might have ignored the aspects of your submission? Could you have wanted more? Sure. But that would give you enough to know because, you know, here is everything that was provided. Here is the record that was being reviewed. Here are the arguments that were made. They were considered and provided to them with the denial letters, right? I mean, I thought we went over that. This came out afterwards. The contemporaneous clinical reviewer notes, yes, were not provided. They were not requested. They were referenced in the appeal letter. They don't know the basis for your conclusions. Well, when you look at the denial letters, they do speak to and they reflect what is essentially, I would say, common term or common parlance for what is reflected within those clinical reviewer notes. It's not like the cases that are pointed out where there's some sort of different justification or different rationale or relying on something different. The clinical reviewer notes are entirely consistent with everything that are in those denial letters. And the denial letters are done in a way to, as ERISA requires, to be calculated, be understood by a claimant. Any further questions for Mr. Harrison? Thank you. Any further questions? All right. Let's hear from the other FLE. Counsel, I think we need... I think we have... Mr. Sullivan, I think, has got three minutes. Good morning, Your Honor. Good morning. Don Sullivan, appearing on behalf of the law firm and the plaintiff. I don't have anything to add. I defer to Mr. Harrison in concealing. Oh, very good. All right. All right. Mr. King, you've got five minutes rebuttal. Thank you, Your Honors. I'll be brief. I know you hear that a lot, but I think I will be. We're not relying solely on those two letters of medical necessity. The medical records, as the panel has pointed out, are clear. They contain undisputed facts. And there is, to use a phrase judged to the par, cherry-picking going on by Anthem in their own review of those medical records. I also think it's an important point that you point out, Judge Hermendorfer, about focusing on the MCG criteria. The MCG discharge criteria contain a much more robust analysis than Anthem ever carried out. And, in fact, Anthem just ignored the functional analysis that those MCG discharge criteria require. And, finally, I would just say this to sum up. There is an important relationship between the procedural components of ERISA's guarantees and promises and the need for substantively correct decision. We've got here an abusive discretion standard of review, sometimes referred to as arbitrary and capricious. It is deferential. There's no doubt about it. It's grossly inappropriate to combine that with allowing Anthem and other insurers and third-party administrators to cut corners on the procedural guarantees of ERISA. If Anthem wants to come to the federal judiciary and say, defer to our decision, they have better well crossed their Ts and dotted their Is in terms of the claim procedure regulations that ERISA has in place. And if they don't have that, for the reason I stated earlier, they're going to encourage claimants who are very dissatisfied with a perfunctory analysis that doesn't pay attention to the facts to come to court and get a remedy. That's not what the federal judiciary wants in these cases. We all want these things to be resolved and finalized for either a claim denial being put in place and have it stick or having a claim denial reversed in that pre-litigation appeal process. And with that, unless you have other questions. Further questions? No. All right, thank you. Thank you. All right, case will be submitted.